**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

_____

**Appeal No.  22-14159-DD**

_____

**UNITED STATES,**

**Appellee**

**v.**

**DAVION RIVERS,**

**Appellant**

_____

**A DIRECT APPEAL OF A CRIMINAL CASE**
**FROM THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**DISTRICT COURT CASES  8:20-cr-252-WFJ-MRM; 8:17-cr-382-JSM-JSS**

_____

**INITIAL BRIEF OF APPELLANT**

_____

ANNE F. BORGHETTI, ESQ.
12211 49th St. N., Ste 1
Clearwater, FL 33762-4300
Florida Bar # 0843385
Telephone:  727-502-0300
Facsimile:  727-502-0303
E-Mail: Anne@BorghettiLaw.com
CJA Counsel for Appellant

No. 22-14159-DD

*United States v. Rivers*

<u>CERTIFICATE OF INTERESTED PERSONS</u>

In compliance with Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.11, the undersigned hereby certifies that the following listed persons and entities have an interest in the outcome of this particular case:

1. Borghetti, Anne F., Counsel for Appellant;

2. Brown, Jeffrey Geldert, Former CJA Counsel for Appellant;

3. Casciola, Jessica, Assistant Federal Public Defender, Former Counsel for Appellant;

4. Chee, David W.A., Assistant United States Attorney;

5. Connally, Charlie Dustin, Assistant United States Attorney;

6. Handberg, Roger B., United States Attorney;

7.  Jung, Hon. William F., United States District Judge;

8.  McCoy, Hon. Mac R., United States Magistrate Judge;

9.  McCoy, Hon. Mac., United States Magistrate Judge;

10. Nebesky, Suzanne C., Assistant United States Attorney;

11. Rivers, Davion, Appellant;

12. Sinacore, Michael Carl, Assistant United States Attorney;

C1 of 2

13. Sweeney, Kathleen M., Assistant Federal Public Defender, Former Counsel for Appellant;

14. Tuite, Hon. Christopher P., United States Magistrate Judge;

15. Wilson, Hon. Thomas G., United States Magistrate Judge;

## **WEB-BASED CIP**

The Web-based CIP was e-filed with nothing to declare, to the Eleventh Circuit Court of Appeals website, www.ca11.uscourts.gov, on the 22nd of December, 2022.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Davion Rivers respectfully requests oral argument on this appeal. Counsel believes oral argument is necessary and will be beneficial to the Court in its resolution of the issues presented herein, particularly given the volume of the record from the lower court and fact-intensive nature of the issues raised herein.

## TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ............................................................. C1

Statement Regarding Oral Argument ...................................................... i

Table of Contents .................................................................................. ii

Table of Citations ................................................................................. v

Statement of Jurisdiction....................................................................... ..1

Statement of Adoption .......................................................................... ..1

Statement of the Issues.......................................................................... 2

Statement of the Case............................................................................ 3

i)     Course of Proceedings and Disposition in the Court Below .......................... 3

ii)    Statement of the Facts ................................................................... 6

iii)   Standards of Review........................................................................ 11

Summary of the Argument..................................................................... 12

Arguments and Citations of Authority.................................................... 13

I.     THE DISTRICT COURT ERRED IN DENYING MR. RIVERS' MOTION TO SUPPRESS THE EVIDENCE FOUND FOLLOWING THE UNLAWFUL ENTRY ONTO THE CURTILAGE OF HIS RESIDENCE AND THE SUBSEQUENT SEARCH OF HIS PERSON.......................................................................... 13

II.    THE DISTRICT COURT ADDITIONALLY ERRED AS A MATTER OF LAW IN DENYING MR. RIVERS' MOTION TO SUPPRESS THE FRUITS OF THE SEARCH WARRANT ...................... 19

## TABLE OF CONTENTS, Continued

**Page**

    A. Law Enforcement's Affidavit Failed to Establish Probable Cause for the Issuance of a Search Warrant for Mr. Rivers' Home ..................19

    B. The Good Faith Exception did not Apply ................................................22

III.    THE DISTRICT COURT ERRED IN APPLYING THE ARMED CAREER CRIMINAL ACT SENTENCING PROVISIONS......................24

    A. The Government Failed to Establish that the Three Proposed Predicate Offenses were Committed on Occasions Different from one Another ...............................................................................................24

    B. The ACCA was Inapplicable Because the Indictment did not Allege all of the Facts Needed and the Jury did not Make the Findings Necessary to Qualify the Proposed Prior Convictions as ACCA Predicate Offenses........................................................................29

Conclusion ........................................................................................................33

Certificate of Compliance with Rule 32(a)............................................................34

Certificate of Service ............................................................................................35

## **TABLE OF CITATIONS**

**Cases**                                                                                                                    **Page**

*Alleyne v. United States*,
    570 U.S. 99, 133 S.Ct 2151, 186 L.Ed.2d 314 (2013)................................. 29-32

*Almendarez-Torres v. United States*,
    523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)............................ 30-32

*Apprendi v. New Jersey*,
    530 U.S. 466, 120 S.Ct 2348 (2000)..................................................... 39-30, 32

*Breard v. Alexandria*,
    341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951).........................................15

*California v. Ciraolo*,
    476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)...................................14

*Collins v. Virginia*,
    --- U.S. ---, 138 S.Ct. 1663, 201 L.Ed.2d 9 (2018).........................................14

*Descamps v. United States*,
    570 U.S. 254, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013)..................................26

*Florida v. Jardines*,
    569 U.S. 1, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013)................................. 14-15

*Johnson v. United States*,
    559 U.S. 133, 130 S.Ct. 1265, 1273, 176 L.Ed.2d 1 (2010)...........................26

*Kentucky v. King*,
    563 U.S. 452, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011)..................................14

*Oliver v. United States*,
    466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)...................................14

*Payton v. New York*,
    445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). ..................................13

## **TABLE OF CITATIONS, Continued**

**Cases (Cont.)**                                                                                  **Page**

*Shepard v. United States*,
    544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005)................... 25-26, 28, 30

*Taylor v. United States*,
    495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)...................................25

*United States v. Brundidge*, 170 F.3d 1350 (11th Cir. 1999) ...................... 5, 19-20

*United States v. Burge*, 407 F.3d 1183 (11th Cir. 2005) .......................................11

*United States v. Farley*, 607 F.3d 1294, (11th Cir. 2010) ......................................11

*United States v. Harris*, 741 F.3d 1245 (11th Cir. 2014) ......................................31

*United States v. Leon*,
    468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)............................... 22-23

*United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002)................................19, 23

*United States v. McGough*, 412 F.3d 1232 (11th Cir. 2005) ................................22

*United States v. Noriega*, 676 F.3d 1252 (11th Cir. 2012)...................................14

*United States v. Palomino-Garcia*, 606 F.3d 1317 (11th Cir. 2010).............. 25-26

*United States v. Penn*, 63 F.4th 1305 (11th Cir. 2023)..........................................27

*United States v. Reeves*, 647 Fed. Appx. 942 (11th Cir. 2016) ....................... 20-21

*United States v. Smith*, 775 F.3d 1262 (11th Cir. 2014)..................................11, 31

*United States v. Sneed*, 600 F.3d 1326 (11th Cir. 2010) ................................24, 28

*United States v. Steed*, 548 F.3d 961 (11th Cir. 2008) .........................................11

## **TABLE OF CITATIONS, Continued**

**Cases (Cont.)**                                               **Page**

*Wooden v. United States*,
    --- U.S. ---, 142 S.Ct. 1063 212 L.Ed.2d 187 (2022)................................... 27-28

*Wong Sun v. United States*,
    371 U.S. 471, 83 S.Ct 401, 9 L.Ed.2d 441 (1963)...........................................17


**Statutes and Rules**

18 U.S.C. § 922.................................................................................................3, 24

18 U.S.C. § 924.................................................................................3-4, 24-25, 30

18 U.S.C. § 3231.......................................................................................................1

28 U.S.C. § 1291......................................................................................................1

11th Cir. R. 26-11 ..................................................................................................C1

11th Cir. R. 28-1 ...................................................................................................34

Federal Rule of Appellate Procedure 26.1 .............................................................C1

Federal Rule of Appellate Procedure 32..................................................................34

## **STATEMENT OF JURISDICTION**

Under 28 U.S.C. § 1291, the courts of appeal have jurisdiction from all final decisions of the district courts of the United States, except where a direct review may be had in the Supreme Court of the United States.

The United States District Court, Middle District of Florida, Tampa Division, had jurisdiction pursuant to 18 U.S.C. § 3231. The district court entered an initial judgment and commitment order on December 9, 2022, followed by an amended judgment on December 13, 2022. (Doc. 178, 181.) Mr. Rivers then filed a timely notice of appeal on December 14, 2022. (Doc. 182.)

## **STATEMENT OF THE ISSUES**

I.      Whether the district court erred in denying the Appellant's motion to suppress evidence found during a warrantless entry onto a porch of his home and a subsequent search of his person?

II.      Whether the district court erred in denying the Appellant's motion to suppress evidence found during a search of his home that was conducted pursuant to a search warrant obtained in response to the Appellant's arrest for allegedly possessing a firearm outside of the home?

III.      Whether the district court erred in sentencing the Appellant under the Armed Career Criminal Act?

## STATEMENT OF THE CASE

### (i)   Course of Proceedings and Disposition in the Court Below

Appellant Davion Rivers was charged by indictment on August 27, 2020 in the United States District Court for the Middle District of Florida, Tampa Division, with one count of possession of a firearm by a convicted felon pursuant to 18 U.S.C. §§ 922(g)(1) and 924(e). (Doc. 1.)   The charges at issue stemmed from a warrantless seizure and search of Mr. Rivers on August 10, 2020. (Doc. 32 at 1-3.)   At that time, Mr. Rivers was serving a term of supervised release imposed in Middle District of Florida Case No. 8:17-cr-382-JSM-JSS.

Prior to trial, Mr. Rivers moved to suppress the fruits of the warrantless search of his person and of a subsequent search of his home. (Doc. 55, 58.)   Mr. Rivers set out that law enforcement illegally entered the curtilage of his home and thereafter detained and searched him without any lawful basis to do so. (Doc. 55, 58.)   He additionally set out that the officers exceeded the scope of any authority they might have had to conduct a simple "knock and talk" on the night in question. (Doc. 55 at 5-6.)   With respect to the subsequent search of the home, which was conducted pursuant to a search warrant, Mr. Rivers asserted that the affidavit sought in support of the search warrant established no nexus to the alleged offense and no probable cause to justify the issuance of a warrant. (Doc. 58 at 3.)

The Government filed responses in opposition to those motions. (Doc. 72, 73.) The district court conducted an evidentiary hearing on the motions on September 30, 2021. (Doc. 117.)  It went on to deny the motions in a written order. (Doc. 93.)

The case then proceeded to a jury trial before the Honorable William F. Jung on July 11, 2022. (Doc. 187.)   The jury ultimately found Mr. Rivers guilty as charged. (Doc. 153.)

On December 9, 2022, the case proceeded to sentencing. (Doc. 188.)  The Presentence Report alleged that Mr. Rivers was subject to a 180-month mandatory minimum sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e), based on prior three prior convictions for distribution of a controlled substance sustained in the case from which he was serving a term of supervised release. (Doc. 173 at 7.) The indictment had alleged that those three prior convictions were for offenses that occurred on March 9, 2017; March 13, 2017; and March 17, 2017. (Doc. 1; 188 at 11.)   Mr. Rivers objected to the application of the ACCA based on the fact that the facts did not establish that the prior convictions did not arise from a single criminal episode and that the qualifying facts of the prior convictions were not charged in the indictment and proven to the jury beyond a reasonable doubt. (Doc. 188 at 10.)

The district court overruled that objection, relying on the dates of offenses listed in the underlying indictment and judgment and the facts set out in the underlying PSR. (Doc. 188 at 11-12.)  The court made the finding:

And then I would just note that based on those records, it appears to me that these are separate incidences. He arrived at different places in different vehicles and sold different drugs on different dates. So as to the objection there, I overrule that objection.

(Doc. 188 at 12.)

The court then calculated the Sentencing Guidelines range at total offense level 33 and criminal history category IV, at which range the Guidelines proposed a sentence of 188 to 235 months. (Doc. 188 at 14.) The court additionally found Mr. Rivers guilty of a Grade B violation of supervised released based on the jury having found him guilty of the new charge. (Doc. 188 at 15-16.) At Mr. Rivers' original criminal history category of II, the Guidelines provided for an advisory range of 6 to 12 months imprisonment on the violation. (Doc. 188 at 15.)

The court sentenced Mr. Rivers to 188 months imprisonment to be followed by five years of supervised release on the firearms conviction. (Doc. 188 at 25-26.) On the violation of supervised release, the court imposed a consecutive sentence of 12 months incarceration with no additional term of supervised release. (Doc. 188 at 27.) The district court entered its judgment on December 9, 2022. (Doc. 178.) It then entered an amended judgment on December 13, 2022. (Doc. 181.)

Mr. Rivers filed a notice of appeal on December 14, 2022. (Doc. 182.)

He remains incarcerated on the judgment and sentence at issue.

**(ii)     Statement of the Facts**

On the evening of August 10, 2020, Bradenton Police Department officers responded to a report of an alleged battery (Doc. 117 at 7-9.) The complainant stated that he had been walking down the street when an unknown male punched him the face several times. (Doc. 117 at 9.) He described the assailant as only a black male with "dreaded" hair. (Doc. 117 at 10, 21.) The complainant did not provide any details as to height, weight, clothing or any other features of the assailant's appearance. (Doc. 117 at 21.) He also alleged that the incident occurred "around the nineteen to two-thousand block of 11th Avenue East" in Bradenton, Florida near a two-story house. (Doc. 117 at 10.)

The responding officers later approached a two-story house in that area and entered the driveway up to a porch of the home. (Doc. 117 at 14, 27.) One of the officers testified that they were approaching the house to look for witnesses or "anything pertaining to the case." (Doc. 117 at 23.) The officer testified that he was familiar with that house from prior contacts years prior. (Doc. 117 at 10-11.) Upon approaching the porch, the officers observed a person later identified as Mr. Rivers on the steps of the porch asleep. (Doc. 117 at 14.)

The front door of the home was at the end of a path that was enclosed by a chain link fence. (Doc. 117 at 24.) The home's mailbox was outside of that fenced in area. (Doc. 117 at 24.) A path to the front door but was enclosed in the fenced

area. (Doc. 117 at 24-25.)  The pathway began behind a gate that was locked with a padlock. (Doc. 55 at 3; 117 at 24-25.)  In that area were also signs with warnings to include: "No trespassing. Authorized personnel only. Theft or vandalism on this site is a felony. Violators will be prosecuted to the fullest extent of the law." (Doc. 55 at 3; 117 at 25-26.)

The officers did not, however, approach the house from that area, but rather, went up the driveway on another side of the house to the porch area where Mr. Rivers was located. (Doc. 117 at 26.)  The fence continued around the border of the property to that area. (Doc. 55 at 4; 117 at 26-27.)  A gate was located at the driveway entrance. (Doc. 55 at 4; 117 at 32.)  That driveway gate was allegedly open on the night in question. (Doc. 117 at 32.)  On a tree near the driveway were signs that included statements such as "Beware of dog," "No trespassing," "Police take notice. Posted no trespassing. Keep out." (Doc. 55 at 4; 117 at 28.)  The officer who testified at the motion hearing alleged that those signs couldn't be seen at night and that he had not seen them that evening. (Doc. 117 at 28.)

The porch at issue was raised above the ground and connected to the ground by two to three steps. (Doc. 117 at 15.)  A railing surrounded the porch but did not completely enclose it. (Doc. 117 at 15.)

As the officers approached the porch, they attempted to wake Mr. Rivers up, going to the point of yelling at him. (Doc. 117 at 15.)  According to one of the

officers, as Mr. Rivers awoke, he yelled for the officers to "get off his grandmother's property." (Doc. 117 at 16.) The officer claimed that he and his fellow officer then began to walk away. (Doc. 117 at 16.) He further claimed that, as they were walking away, Mr. Rivers told them several times to stop and asked why they were at the house. (Doc. 117 at 16.) The officer claimed that, as he reached the roadway area, Mr. Rivers purportedly stepped in front of him and pushed him. (Doc. 117 at 17.) Mr. Rivers then allegedly turned and began walking down the roadway. (Doc. 117 at 18.) The officer alleged that, as Mr. Rivers turned, he saw the butt of a handgun sticking out of Mr. Rivers' pocket. (Doc. 117 at 18.) The officer then deployed a taser on Mr. Rivers. (Doc. 117 at 18.) Law enforcement then handcuffed and searched Mr. Rivers. (Doc. 117 at 18-19.) The officer alleged to have found a Taurus Judge handgun in one of Mr. Rivers' pockets. (Doc. 117 at 19.)

After Mr. Rivers was arrested, law enforcement sought a search warrant for the search of Mr. Rivers' home. (Doc. 58 at 2.) The affidavit submitted in support of the requested warrant stated in part, that based on the "training and experience" of attesting detective, "people who own and/or possess firearms commonly have spare or extra ammunition with in [sic] their residence." (Doc. 58 at 2.) A state court later issued the search warrant. (Doc. 58 at 2.) Law enforcement thereafter searched the home on August 18, 2020. (Doc. 58 at 2.) A .410 shotgun shell was found during that search. (Doc. 58 at 2.)

In its order denying the motions, the district court held that the officers acted within the scope of an implied license to approach the home to knock and attempt to speak to any persons at the home. (Doc. 93 at 7.) The court noted that the front door of the home faced the street and was enclosed within a closed and locked fence. (Doc. 93 at 7-8.) It further noted that the mailbox and a no trespassing sign were located in front of that area. (Doc. 93 at 7-8.) It found, nonetheless, that the customary entrance to the home was located on the side of the house leading up from the driveway where the officers had entered. (Doc. 93 at 8.) In so holding, the court relied on the facts that cars were parked in that area and that "[t]he photos provided by both the Government and Defendant show the rear entrance gate to be open at least 20 feet wide across the driveway." (Doc. 93 at 8.) It also found the gate was shorter than the fence that surrounded the front area of the home and that it appeared that the residents may have placed their trash cans on the street near the driveway entrance. (Doc. 93 at 8.) The court went on to hold that "… this customary entrance to the home off 11th Avenue East was not blocked or closed off in such a way that the police's implied license to conduct a 'knock and talk' had been revoked." (Doc. 93 at 8.) The court concluded:

> Additionally, the wooden deck where the officers first encountered Defendant does not appear to be curtilage of the house. Even if this open porch amounted to curtilage, Officer Morningstar testified without contradiction that the officers did not enter or step upon it. Moreover, Officer Morningstar stated that he and the other officer immediately departed when they were told to do so by Defendant.

Accordingly, the motion to suppress the gun seized from Defendant's pocket is denied.

(Doc. 93 at 8-9) (footnote omitted).  The court additionally found that the officers would have also had cause to search Mr. Rivers incident to arrest. (Doc. 93 at 9.)

With respect to the motion to suppress the fruits of the search warrant, the court found that the affidavit submitted in support of the warrant "sufficiently demonstrated probable cause that firearms or gun accoutrements would be present on the property." (Doc. 93 at 10.)  The court further held that "even if probable cause were found to be lacking, it could not be lacking by much. The good faith exception would apply." (Doc. 93 at 11.)

At trial, the Government presented the testimony of the two officers who made the arrests, along with other witnesses.  (Doc. 187 at 94-146.)  While Mr. Rivers did not testify at the motion to suppress hearing, he did testify at the trial. (Doc. 187 at 147-57.)  Mr. Rivers testified that he asked the officers to leave after they woke him up. (Doc. 187 at 149.)  The officers did not, however, leave the property. (Doc. 187 at 149.)  He additionally testified that the officers patted him down as soon as he stood up from the porch. (Doc. 187 at 150.)  The officers did not, however, find any gun. (Doc. 187 at 150.)  Mr. Rivers further testified that he never pushed any of the officers. (Doc. 187 at 150.)  He likewise testified that he did not have possession of a firearm that night. (Doc. 187 at 150-51.)  With respect to text messages located in his phone that discussed the purchase of the purported firearm, Mr. Rivers testified

that he had not sent or received those messages and that other persons used his phone. (Doc. 187 at 193.)

The jury went on to find Mr. Rivers guilty as set forth above.

This appeal follows.

### (iii)    <u>Standards of Review</u>

As to Issues I and II, this Court reviews the denial of a motion to suppress under a mixed standard of review. *United States v. Farley*, 607 F.3d 1294, 1325-26 (11th Cir. 2010). The trial court's legal conclusions are reviewed de novo, while its factual findings are reviewed for clear error. *Id.*

As to Issue III, this Court reviews constitutional sentencing issues de novo. *United States v. Smith*, 775 F.3d 1262, 1266 (11th Cir. 2014) *citing United States v. Steed*, 548 F.3d 961, 978 (11th Cir. 2008). It similarly reviews a "district court's legal interpretation of the statutes and Guidelines de novo." *United States v. Burge*, 407 F.3d 1183 (11th Cir. 2005).

## SUMMARY OF THE ARGUMENT

The district court erred in denying both of the motions to suppress.  With respect to the motion to suppress the search of Mr. Rivers' person, law enforcement entered an area in the curtilage of Mr. Rivers' residence that was not open to the public.  As a result, it did not have a lawful basis to conduct a "knock and talk" or to otherwise enter that area of the property.  While the events that followed were in dispute, the subsequent arrest and search of Mr. Rivers were the direct result of the Fourth Amendment violation that arose from the unlawful entry onto the curtilage of the residence.

When law enforcement thereafter submitted an affidavit in support of a search warrant for Mr. Rivers' home, the affidavit was far from sufficient to establish a reasonable likelihood that evidence connected to the offense would be located in the home.  The affidavit was indeed so lacking in sufficient corroborating facts that no reasonable law enforcement officer would rely on the subsequently issued search warrant in good faith.

As to the sentence imposed, the district court erred in sentencing Mr. Rivers under the Armed Career Criminal Act because a) it erroneously found that the three proposed prior predicate offenses were committed on occasions different from one another and b) the indictment did not allege, and jury did not find, all of the specific facts required to qualify the proposed prior convictions as ACCA predicates.

## ARGUMENTS AND CITATIONS OF AUTHORITY

### I.

**THE DISTRICT COURT ERRED IN DENYING MR. RIVERS' MOTION TO SUPPRESS THE EVIDENCE FOUND FOLLOWING THE UNLAWFUL ENTRY ONTO THE CURTILAGE OF HIS RESIDENCE AND THE SUBSEQUENT SEARCH OF HIS PERSON.**

The entry on Mr. Rivers' property and the subsequent detention and search of his person violated the Fourth Amendment. The district court first erred in holding that law enforcement conducted a valid "knock and talk" entry onto the curtilage of Mr. Rivers' home. The evidence presented at the evidentiary hearing established that the entrance that law enforcement used to access the home was not the customary entrance to the home and was not open to the public. Law enforcement's entry onto the property from that location was an unlawful trespass. From there, the later seizure and search of Mr. Rivers was a direct result of law enforcement's illegal entry onto the property. For that reason, the arrest and search incident to arrest of Mr. Rivers were fruits of the earlier Fourth Amendment violation. The district court thereby erred as a matter of law in denying the motion to suppress the evidence resulting from the search of Mr. Rivers' person.

The United States Supreme Court has long held that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not be reasonably crossed without a warrant." *Payton v. New*

*York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). That protection also extends to the curtilage of a home. *United States v. Noriega*, 676 F.3d 1252, 1263 (11th Cir. 2012) *see also Collins v. Virginia*, --- U.S. ---, 138 S.Ct. 1663, 1669-70, 201 L.Ed.2d 9 (2018). The curtilage of a home includes "the area 'immediately surrounding and associated with the home' and is considered 'part of the home itself for Fourth Amendment purposes.'" *Collins*, 138 S.Ct at 1670 *quoting Florida v. Jardines*, 569 U.S. 1, 6, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)). "'The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.'" *Id quoting California v. Ciraolo*, 476 U.S. 207, 212–213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986). Law enforcement must thereby have a warrant or an express or implied license to enter the curtilage of a home. *See Jardines*, 569 U.S. at 7-8.

While the "knock and talk" exception to the warrant requirement permits law enforcement to enter the curtilage of a home to knock and attempt to make contact with any persons located at the residence, that exception does not permit law enforcement to do anything more than a private person would be permitted to do when entering to knock on the door of a residence. *Kentucky v. King*, 563 U.S. 452, 469, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011). As a result, under the knock and talk

exception, law enforcement may only take the same actions that a door-to-door salesperson would be permitted to take at a private residence. *See id.* Accordingly, the Supreme Court has held that a "'knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.'" *Jardines*, 569 U.S. at 8 *quoting Breard v. Alexandria*, 341 U.S. 622, 626, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* In so holding, the Court analogized the scope of the entry permitted under the knock and talk exception with the actions taken by trick-or-treaters or Girl Scouts selling cookies. *Id.*

As the foregoing establish, a "knock and talk" cannot be lawful if law enforcement enters an area of the curtilage that is not open to the public. That is precisely what transpired in the instant case. The evidence presented at the evidentiary hearing clearly established that the front of Mr. Rivers' home was surrounded by a fully enclosed fenced that was locked. The mailbox laid outside of that fence. Moreover, on that fence was a detailed "no trespassing" sign. That front door of the home was clearly not open to the public.

Despite those clear indications that neither the public nor law enforcement had any implied license to enter the curtilage of that home, law enforcement entered

a secondary entrance to the property located at a driveway of the home.  Contrary to the district court's findings, the evidence did not establish that that was a "customary entrance" to the residence or an area that was otherwise open to the public.  Perhaps most notably, in the proximity of the open gate that law enforcement entered were a "beware of dog" sign and two additional "no trespassing" signs including one that was specifically directed at law enforcement.  Given the placement of those signs, no salesperson, Girl Scout or trick-or-treater would reasonably believe that that area of the curtilage was open to the public.  That area, just the same, was not open to law enforcement to enter without a warrant or exigent circumstances.  While the officer who testified at the motion to suppress hearing alleged that he had not seen those signs, the officers' failure to make what should have been an obvious observation did not diminish Mr. Rivers' reasonable expectation of privacy.

Notwithstanding the no trespassing signs, the remaining evidence did not establish that the driveway area of the home was open to the public.  While the area where the porch at issue was located was not fully enclosed by a fence as the front area of the home was, it was still largely enclosed.  No evidence was presented of any "knocker" having been located in the area of the porch entrance to the home.  Moreover, contrary to the district court's reasoning, the facts that cars were parked in the driveway area and that the residents may have used the porch entrance to access the home did not constitute an implied license for the public to similarly

access that area of the curtilage.  To be sure, the totality of the circumstances, including the posted signage, clearly indicated that that area of the property was not open to the public.

Under the circumstances, *no* entrance to the home was open to the public.  The mere fact that a gate may have been open at the driveway entrance to the home simply did not mean that that area of the residence was open to the public.  The district court consequently erred in finding that law enforcement conducted a valid "knock and talk" when they entered the curtilage of the home and made contact with Mr. Rivers.

From there, the observations and additional contact that law enforcement had with Mr. Rivers were fruits of the Fourth Amendment violation that resulted from the illegal entry onto Mr. River's property. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct 401, 9 L.Ed.2d 441 (1963).  While Mr. Rivers vehemently disputed law enforcement's account of what transpired after law enforcement woke him up on the porch, the events that followed undoubtedly would not have occurred but for law enforcement's illegal entry onto the curtilage of the property.  The subsequent arrest and detention of Mr. Rivers were, therefore, fruits of the poisonous tree.  Consequently, in contrast to the district court's reasoning, the search of Mr. Rivers' person could not have been a valid search incident to arrest.

Given the foregoing, law enforcement lacked any legally justifiable reason for entering the curtilage of Mr. Rivers' residence.  All evidence obtained following that illegal entry, including the firearm and the alleged observations of a firearm, were fruits of that Fourth Amendment violation.  The district court therefore clearly erred in denying Mr. Rivers' motion to suppress.  The motion to suppress, in turn, was dispositive, as the firearm at issue would not have been recovered but for the unlawful entry onto the curtilage of Mr. Rivers' home.

## II.

### THE DISTRICT COURT ADDITIONALLY ERRED AS A MATTER OF LAW IN DENYING MR. RIVERS' MOTION TO SUPPRESS THE FRUITS OF THE SEARCH WARRANT.

In addition to the error in denying the motion to suppress the fruits of the search of Mr. Rivers' person, the district court likewise erred in denying the motion to suppress evidence obtained as a result of the subsequently issued search warrant. Given the facts and circumstances set forth above, law enforcement's affidavit in support of the search warrant was far from sufficient to establish probable cause to support the issuance of a search warrant. The affidavit was indeed so lacking in probable cause that the good faith exception could not apply to permit the Government's use of evidence obtained as a result of that deficient warrant.

### A. Law Enforcement's Affidavit Failed to Establish Probable Cause for the Issuance of a Search Warrant for Mr. Rivers' Home

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). To establish probable cause, an affidavit submitted in support of a search warrant must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (quotation omitted). The totality of the circumstances should likewise "allow a conclusion that

19

there is a fair probability of finding contraband or evidence at a particular location"
to be searched. *Brundidge*, 170 F.3d at 1352.

In the instant case, the search warrant affidavit was woefully insufficient to
establish the required nexus between the offense and the property to be searched.
The affidavit merely relied on the affiant's "training and experience" and what was
essentially his hunch that relevant evidence would be found in the residence given
that Mr. Rivers allegedly possessed a firearm on the curtilage of the residence. The
affiant pointed to no relevant facts, aside from Mr. Rivers' alleged possession of a
firearm, that would lead to any reasonable likelihood that evidence of a crime would
be found within Mr. Rivers' home. Probable cause could not result from such
speculation. Indeed, under the reasoning of the district court in granting the motion,
any person arrested for unlawful possession of a firearm would be subject to a search
of his or her home.

In granting the motion to suppress, the district court relied on the unpublished
opinion of this Court in *United States v. Reeves*, 647 Fed. Appx. 942 (11th Cir.
2016). The facts of *Reeves* were, however, markedly different from those of the
instant case. In *Reeves*, the defendant was being arrested on a warrant for failure to
pay child support. *Id.* at 944. Upon being told that he was being arrested, the
defendant asked to retrieve his wallet from a table inside his apartment. *Id.* A law
enforcement officer assisted the defendant in doing so. *Id.* At that time, the officer

saw a handgun next to the defendant's wallet. *Id.* He then unloaded the gun and left it and its ammunition on the table in the defendant's apartment. *Id.* The officer then locked the door to the apartment at the defendant's request. *Id.* The officer later learned, however, that the defendant was a convicted felon. *Id.* Law enforcement later sought and obtained a search warrant for the apartment based on the arresting officer's observations. *Id.* On appeal, this Court affirmed the denial of a motion to suppress the fruits of that search warrant. Based on the facts of that case, this Court held:

> The affidavit, reflecting an officer's personal observation of the pistol combined with the evidence of Reaves's prior felony convictions, provided the magistrate judge with enough evidence to make the common-sense determination that a fair probability existed that firearms, ammunition, and records related to the ownership and control of the property would be found inside Reaves's residence.

*Id.* at 946.

In contrast to *Reeves*, law enforcement never observed a firearm, nor any other evidence inside of Mr. Rivers' home. Unlike the *Reeves* defendant, Mr. Rivers, moreover, was not alleged to have possessed the firearm inside the home. The only potential nexus between Mr. Rivers' alleged offense and his home was the mere fact that Mr. Rivers allegedly lived in that residence. Again, under the circumstances, the alleged justification underlying the issuance of the search warrant of Mr. Rivers' home would provide a basis for searching the home of nearly any arrestee. The

Fourth Amendment provides far greater protections than such a conclusion would allow.

## B. The Good Faith Exception did not Apply

In addition to the error in finding that probable cause existed for the issuance of a search warrant, the district court further erred in finding that the good faith exception would save the fruits of the unlawful search warrant. Under the good faith exception to the exclusionary rule, even when a search warrant is found to be invalid, evidence obtained in good faith, reasonable reliance on the defective search warrant may still be admissible. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The Supreme Court held in *Leon* that the Government would not be barred from using evidence that was obtained from a faulty search warrant "*by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate* but ultimately found to be unsupported by probable cause." *Id.* at 900, 905 (emphasis added). The Government bears the burden of proving the applicability of the good faith exception. *United States v. McGough*, 412 F.3d 1232, 1239 (11th Cir. 2005). This Court has recognized that four exceptions exist to the *Leon* good faith exception:

> (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;"
> (2) "where the issuing magistrate wholly abandoned" his detached and neutral judicial role;

(3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and

(4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient - *i.e.*, in failing to particularize the place to be searched or the things to be seized - that the executing officers cannot reasonably presume it to be valid."

*Martin*, 297 F.3d at 1313 (11th Cir. 2002) *quoting Leon*, 468 U.S. at 923.

In the instant case, the affidavit submitted in support of the search warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* Furthermore, given the clear shortcomings in the affidavit, the state court judge who issued the warrant could only have wholly abandoned his role as a neutral arbiter when he issued a warrant based on that affidavit. As set forth above, the affidavit was a mere fishing expedition supported only by the fact that Mr. Rivers resided in the home to be searched. Consequently, the existence of probable cause was not, as the district court reasoned, even a close call. Under the totality of the circumstances, no reasonable law enforcement officer could rely in good faith on a warrant issued pursuant to that affidavit.

For all of the reasons set forth above, the district court erred in denying Mr. Rivers' motion to suppress to the fruits of the search of his home. Therefore, should the Court decline to remand with instructions to enter an order of dismissal based on the preceding issue, Mr. Rivers would respectfully request the Court to vacate the judgment and remand this case with instructions to order a new trial.

### III.

## THE DISTRICT COURT ERRED IN APPLYING THE ARMED CAREER CRIMINAL ACT SENTENCING PROVISIONS

The district court additionally erred as a matter of law in finding that Mr. Rivers had three qualifying prior convictions to trigger the application of the Armed Career Criminal Act provisions. The Government failed to adequately allege in the indictment and prove to the petit jury that Mr. Rivers committed three qualifying offenses on separate occasions. The evidence before the district court, moreover, failed to establish that the three alleged prior convictions from the underlying federal case were anything more than one continuous criminal episode. For those reasons, the proposed convictions did not qualify as three separate predicate "serious drug offenses" under the ACCA.

### A. The Government Failed to Establish that the Three Proposed Predicate Offenses were Committed on Occasions Different from one Another

The Armed Career Criminal Act ("ACCA"), set forth in 18 U.S.C. § 924(e), calls for the imposition of a mandatory sentence of 15 years imprisonment on a conviction under 18 U.S.C. § 922(g) if the defendant has "three previous convictions…for a violent felony or a serious drug offense, or both, *committed on occasions different from one another…*" *United States v. Sneed*, 600 F.3d 1326, 1329 (11th Cir. 2010) *quoting* 18 U.S.C. § 924(e)(1) (emphasis added).

The statute goes on to define the term "serious drug offense" as:

24

(i) an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46 for which a maximum term of imprisonment of ten years or more is prescribed by law; or

(ii) an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law…

18 U.S.C. § 924(e)(2)(A)(i)-(ii).

The Supreme Court and this Court have held that the label a state attaches to an offense is not indicative of whether the offense qualifies as a predicate offense under the ACCA. *United States v. Palomino-Garcia*, 606 F.3d 1317, 1326 (11th Cir. 2010) *citing Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) and *Shepard v. United States*, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). In *Taylor*, *Shepard*, and the cases that have followed them, courts have addressed the use of "categorical approach" and "modified categorical approach" in making the determination as to whether a defendant's sentence and/or Guidelines range should be enhanced on the basis of a prior conviction. Under the categorical approach, a court looks to the law underlying the prior conviction to determine if the offense at issue is the equivalent of one of the generic enumerated offenses. *Palomino-Garcia*, 606 F.3d at 1331-34, 1336. Under that analysis, the Court determines the elements of the applicable generic offenses at issue by looking to "the elements of the crime that are common to most states' definitions of that crime, as

well as learned treatises, and the Model Penal Code." *Palomino-Garcia*, 606 F.3d at 1331.  The Court then determines, based on the elements of the generic offense, if the prior conviction is the equivalent of the corresponding generic offense. *Id.* If, however, the law underlying the prior conviction does not fall into the generic class of enumerated offenses, but rather, "contains different statutory phrases -- some of which require the use of force [or constitute a serious drug offense] and some of which do not -- the judgment is ambiguous and [courts should therefore] apply a 'modified categorical approach.'" *Id. citing Johnson v. United States*, 559 U.S. 133, 130 S.Ct. 1265, 1273, 176 L.Ed.2d 1 (2010).

The modified categorical approach is to be employed in cases involving such divisible statutes. *Descamps v. United States*, 570 U.S. 254, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013).  Under the modified categorical approach, a court may look to the actual offense of conviction, and the alternative means of prosecution it fell under within the statute of conviction, to determine if the elements of the crime of conviction are consistent with the elements of the generic offense. *Id.* at 257.  In making that determination, the Court may consult the "narrow universe of *Shepard* documents", including the transcript of the defendant's plea colloquy, the charging documents, and any factual findings of the trial court, to determine if the offense would otherwise qualify as a crime of violence. *Palomino-Garcia*, 606 F.3d at 1337 (citations omitted).

26

With respect to making the determination of whether prior convictions were committed on occasions different from one another, the Supreme Court recently held in *Wooden v. United States*, --- U.S. ---, 142 S.Ct. 1063 212 L.Ed.2d 187 (2022), that a "multi-factor" inquiry must be made into the facts of prior offenses to determine whether the offenses occurred on occasions different from one another. *Id.* at 1070-71. This Court has likewise found since *Wooden* that "[s]everal factors may be relevant to that determination: the amount of time between offenses, the proximity of the locations where the offenses occurred, and whether the offenses are part of the same scheme or achieve the same objective." *United States v. Penn*, 63 F.4th 1305, 1318 (11th Cir. 2023) *citing id.* The Court also noted that the Supreme Court provided in *Wooden*, that "'[i]n many cases, a single factor—especially of time or place—can decisively differentiate occasions.'" *Id. quoting Wooden*, 142 S.Ct at 1071. The Court likewise provided that "the Supreme Court noted that lower courts 'have nearly always treated offenses as occurring on separate occasions if a person committed them a day or more apart, or at a 'significant distance.'" *Id. quoting id.* Nonetheless, "'Offenses committed close in time, in an uninterrupted course of conduct, will often count as part of one occasion; not so offenses separated by substantial gaps in time or significant intervening events.'" *Id. quoting id.*

Prior to *Wooden*, this Court held that, for purposes of determining if offenses were committed on occasions different from one another, the modified categorical

approach promulgated in *Shepard* controls. *Sneed*, 600 F.3d at 1331-1333. Consequently, the Government may no longer rely on police reports in support of an argument that offenses occurred on occasions different from one another, but rather, must rely only on *Shepard* approved documents such as statutory definition, charging documents, written plea agreements, admissions by the defendant, and any explicit factual findings made by the trial court. *See id* at 1333.

In the instant case, the *Shepard* documents failed to establish that the three proposed predicate offenses were committed on offenses different from one another rather than one continuous criminal episode. The alleged acts of distribution were alleged to have been committed within an eight-day span. They were all charged in the same indictment. While the district court stated that it relied on facts set out in the indictment, judgment and PSR, it did not articulate facts that were sufficient to establish that the offenses were committed on occasions different from one another despite having been committed on separate dates. Indeed, the record is insufficient to establish that the district court undertook the multi-factor analysis required under *Wooden* to determine that those offenses were not one continuous criminal episode. As a result, the record does not establish that the three predicate offenses were committed on occasions different from one another so as to support the application of the ACCA sentencing provisions.

**B. <u>The ACCA was Inapplicable Because the Indictment did not Allege all of the Facts Needed and the Jury did not Make the Findings Necessary to Qualify the Proposed Prior Convictions as ACCA Predicate Offenses</u>**

The district court further erred in applying the ACCA sentencing provisions because the indictment failed to allege all of the facts needed to sustain the application of the ACCA. The jury, in turn, did not make the findings necessary to support the ACCA's enhanced sentencing provisions. Mr. Rivers recognizes that this Court's precedent has thus far foreclosed this sub-argument.

The Supreme Court held in *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct 2151, 186 L.Ed.2d 314 (2013), that "any fact that increases the mandatory minimum [sentence for a criminal offense] is an element that must be submitted to the jury." *Id* at 2155. In so holding, the Court essentially extended the requirements of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct 2348 (2000), to apply to facts underlying mandatory minimum sentencing enhancements. *Id.* Likewise, in holding that any fact that increases a mandatory minimum sentence is an element of the offense, the Court also essentially required that any such fact must also be set forth in the indictment. *See id* at 108-17 (tracing and discussing the legal history leading to the Court's conclusion and finding "[f]rom these widely recognized principles followed a well-established practice of including in the indictment, and submitting to the jury, every fact that was a basis for imposing or increasing punishment." *Id.* at 109-10).

When it decided *Alleyne*, the Supreme Court stopped short of addressing whether its holding in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), would be affected by its holding in *Alleyne*. *Id.* at 111 n.1. In *Almendarez-Torres*, which was decided prior to *Apprendi*, the Court held that a prior conviction that triggers a sentencing enhancement need not be alleged in the indictment or proven beyond a reasonable doubt. *Almendarez-Torres*, *supra*, 523 U.S. 224. In the *Alleyne* opinion, the Court reasoned that, because *Alleyne* did not involve a sentencing enhancement brought on by a prior conviction, it did not have reason to readdress the *Almendarez-Torres* holding. *Id.*

In cases involving the charge of being a felon in possession of a firearm, section 924(a) provides for a ten-year statutory maximum sentence. 18 U.S.C. § 924(a)(2). The 15-year mandatory minimum required under section 924(e) thereby increases the sentence above the otherwise applicable statutory maximum sentence. Consequently, the *Alleyne* reasoning requires that the specific facts needed to support an ACCA sentence be charged in the indictment and admitted at the time of the plea or proven to a jury beyond a reasonable doubt. *See Shepard*, 544 U.S. at 27-28 (Thomas, J., concurring in part and concurring in the judgment). Moreover, the ACCA depends on findings of fact that go beyond the elements of the prior offenses, including findings such as whether the offenses were committed on different occasions.

In the instant case, while the indictment listed the alleged predicate offenses that would be used for the ACCA enhancement, it did not list all of the requirements needed to qualify those prior convictions as "serious drug offenses" committed on occasions different from one another.  More critically, the jury did not make the requisite findings that would be needed to qualify any of those prior convictions as ACCA qualifying predicate convictions.  Consequently, the imposition of the ACCA sentence violated Mr. Rivers' Fifth and Sixth Amendment rights.

Mr. Rivers recognizes that this Court has rejected the foregoing argument in light of *Almendarez-Torres*. *See United States v. Smith*, 775 F.3d 1262, 1265-66 (11th Cir. 2014).  The Court has held that "*Alleyne* did not overrule *Almendarez–Torres*, and the Fifth and Sixth Amendments do not limit the use of [the defendant]'s prior convictions." *Id. citing United States v. Harris*, 741 F.3d 1245, 1250 (11th Cir. 2014).  The Court also added however, that "[w]e acknowledged in *Harris* that there is 'some tension' between *Almendarez–Torres* and *Alleyne*, but 'we are bound to follow *Almendarez–Torres* unless and until the Supreme Court itself overrules that decision.'" *Id. quoting Harris*, 741 F.3d at 1250 (internal quotation marks and citations omitted in original).

Recognizing this Court's precedent, Mr. Rivers respectfully submits that the *Alleyne* holding should extend to *any* fact that triggers a sentencing enhancement, including the fact of a prior conviction.  While the Court did not readdress

*Almendarez–Torres* under the circumstances at issue in *Alleyne*, it explicitly stated that "*Any* fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne*, 570 U.S. at 102 (emphasis added). Moreover, when the Supreme Court decided *Apprendi*, it specifically made an exception for prior-conviction sentencing enhancements. *Apprendi*, 530 U.S. at 490. In *Alleyne*, on the other hand, the Court provided for no such exceptions. In contrast, the Court repeatedly stated that *any* fact that increases a mandatory minimum sentence must be an element of the offense. Therefore, notwithstanding the error in finding that the proposed predicate offenses were committed on different occasions, Mr. Rivers further requests this Court to find that the district court erred in applying the ACCA sentencing provisions based on the reasoning of *Alleyne* and its progeny.

## <u>CONCLUSION</u>

Based on the foregoing, Appellant Davion Rivers respectfully requests that this Honorable Court reverse the judgment and sentences imposed in this cause and remand the case to the district court with instructions to enter an order of dismissal or, in the alternative, an order for a new trial. Should the Court decline to reverse the convictions, Mr. Rivers would ask this Court to vacate the sentence and remand the case to the district court for a new sentencing hearing.

Respectfully Submitted,

<u>s/ *Anne F. Borghetti*</u>
ANNE F. BORGHETTI, ESQ.
12211 49th St. N., Ste 1
Clearwater, FL 33762-4300
Florida Bar # 0843385
Telephone: 727-502-0300
Facsimile: 727-502-0303
E-Mail: Anne@BorghettiLaw.com
CJA Counsel for Appellant

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The undersigned certifies, pursuant to 11th Cir. R. 28-1, that this Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure because it contains 7,674 words, excluding the parts exempted by subsection 32(a)(7)(B)(iii).  Microsoft Word software was used to count the words in the foregoing Brief.  This Brief, likewise, complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman font.

s/ <i>Anne F. Borghetti</i>
ANNE F. BORGHETTI, ESQ.
12211 49th St. N., Ste 1
Clearwater, FL 33762-4300
Florida Bar # 0843385
Telephone:  727-502-0300
Facsimile:  727-502-0303
E-Mail: Anne@BorghettiLaw.com
CJA Counsel for Appellant

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, on June 12, 2023.

s/ *Anne F. Borghetti*
ANNE F. BORGHETTI, ESQ.
12211 49th St. N., Ste 1
Clearwater, FL 33762-4300
Florida Bar # 0843385
Telephone:  727-502-0300
Facsimile:  727-502-0303
E-Mail: Anne@BorghettiLaw.com
CJA Counsel for Appellant

I FURTHER CERTIFY that four hard copies of the foregoing brief are being furnished to the Clerk of this Court by mail.

s/ *Anne F. Borghetti*
ANNE F. BORGHETTI, ESQ.
12211 49th St. N., Ste 1
Clearwater, FL 33762-4300
Florida Bar # 0843385
Telephone:  727-502-0300
Facsimile:  727-502-0303
E-Mail: Anne@BorghettiLaw.com
CJA Counsel for Appellant